UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

                                       Case No. 08-cr-20474

ERNEST ADAM CSOLKOVITS,               Honorable Julian Abele Cook, Jr.

       Defendant.

ORDER

In a multi-count indictment that was filed on September 16, 2008, a grand jury charged the Defendant, Ernest Adam Csolkovits, with (1) sixteen counts of wire fraud in violation of 18 U.S.C. § 1343, (2) one count of engaging in a monetary transaction in criminally-derived property in violation of 26 U.S.C. § 1957(a), (3) one count of impeding the administration of the Internal Revenue Service laws in violation of 26 U.S.C. § 7212(a), and (4) one count of submitting false documents to the Internal Revenue Service in violation of 18 U.S.C. § 1001. Currently before the Court are two motions related to a prior order in which the Court required the Government to pay reasonable fees to an attorney who would represent Csolkovits in the "witness" depositions that are scheduled to take place in the Bahamas. (Order of Feb. 22, 2011, ECF No. 39).

I.     Procedural History

On April 29, 2009, the Court granted the Government's motion pursuant to Fed. R. Crim. P. 15(a) to depose certain Bahamian residents for the primary purpose of  preserving their

1

testimonies for trial. On January 11, 2011, after receiving Csolkovits's financial affidavit of indigence, the Court granted his request for the entry of an order that would require the Government to pay the "costs of [D]efendant's and his attorney's travel and subsistence expenses" to attend these depositions. *See* Fed. R. Crim. P. 15(d). The depositions, which were originally scheduled to begin on March 7, 2011, have now been rescheduled for the week of June 20, 2011. On February 22nd, the Court entered an order that obligated the Government to assume and pay reasonable attorney fees and expenses to retain a local Bahamian counsel who would represent Csolkovits's interests during the depositions.[1]

On February 28th, the Government filed a motion in which it petitioned the Court to reconsider the efficacy of its order. The Government contends that (1) the Court erred in ordering the payment of monies pursuant to the Treaty on Mutual Assistance in Criminal Matters, U.S.-Bah., June 12-Aug. 18, 1987, S. Treaty Doc. No. 100-17 ("Treaty") because an attorney can only be appointed along with an order of payment under the Criminal Justice Act, 18 U.S.C. § 3006A(e)(1) ("CJA"); (2) the requirement that the Government pay Csolkovits's Bahamian attorney creates an inherent conflict of interest; and (3) the depositions should be permitted to proceed with or without Bahamian counsel because Csolkovits will not suffer any prejudice.

In response, Csolkovits filed a motion in which he requested that the Court adjourn or

---

[1] Under the applicable Bahamian rules, foreign counsel may not actively participate in depositions. Rather, they are permitted to submit written interrogatories which, in turn, can be presented to the witnesses by the Bahamian Office of the Attorney General or the presiding magistrate. Csolkovits argued - and the Court agreed - that this procedure did not comport with his Sixth Amendment right to confront potentially adverse witnesses. In reaching this conclusion, the Court concluded that Csolkovits's constitutional rights could be adequately protected only if he is represented by a local Bahamian attorney who could actively and directly examine the witnesses.

cancel the currently scheduled depositions because the "unnecessary delay by the United States to establish a mechanism carry out this Court's Order to pay for the costs of local Bahamian counsel for the Defendant at the depositions has substantially interfered with [his] ability" to arrange for, and prepare, local counsel. The Government has objected to this characterization, and, in so doing, it has placed the blame squarely on Csolkovits, but for whose delaying tactics, the Government contends, "we would not be in this extremely awkward situation."

A hearing on these two motions was scheduled for March 3, 2011. However, based upon the representations of the parties that (1) the Bahamian authorities were potentially willing and able to reschedule the depositions for June 2011; and (2) they are committed to working together to determine whether there were more cost-effective measures by which to conduct the depositions,[2]

---

[2]Csolkovits's counsel advised the Court that his initial inquiries indicated that the prevailing rate for Bahamian counsel is $425 per hour, and it is anticipated that such an attorney will expend approximately twenty-four hours of work on this case. The Court notes that, in his reply brief, Csolkovits for the first time states a belief that more than twenty-four hours will be required. Csolkovits suggests that the Government has unilaterally conceived the twenty-four hour approximation without any justification. (Def.'s Reply in Support of Mot. for Supplemental Order at 2 ("[T]he Government appears to underestimate the time that will be required for Ms. Forbes to prepare to perform in her role at the depositions. . . . It is, of course, difficult to anticipate the total number of hours that will be required for Ms. Forbes'[s] work. However, it is likely it will exceed the 24 hour limit proffered in the Government's response.")). However, the parties have consistently represented to the Court their *shared* belief that approximately twenty-four hours of work would be required. (*See* Pl.'s Mot. for Reconsideration at 9 n.1 ("Both Mr. Gurewitz and I have discussed our view that approximately 24 hours of time might be required for Bahamian defense counsel to prepare and participate in up to 10 hours of deposition time and only engage in cross-examination of the two witnesses."); Def.'s Mot. to Adjourn Depositions at 5 ("The Government has forthrightly acknowledged 'that approximately 24 hours of time might be required . . . .'"); Pl.'s Resp. to Def.'s Mot. for Supplemental Order at 1 ("With Ms. Forbes'[s] lower hour rate of $250, counsels' best estimate is that her fees should not exceed $6,000 for 24 hours of work including her attendance at the depositions."). The Government also orally represented - without any dispute from Csolkovits - during the March 3, 2011, status conference that *both* the Government and Csolkovits agreed that twenty-four hours would be sufficient. Csolkovits has not ever - until this most recent brief - expressed a belief that this figure might be too low. Therefore, the Court will limit the Government's present obligation to

3

the parties stipulated to the denial for mootness of Csolkovits's motion and the Court converted the hearing into a status conference. Thereafter, the status conference was continued until April 12th, and the parties were directed to follow up any possible avenues for resolving this disputed issue. Specifically, the parties were to research the following possibilities: (1) performing the depositions by video; (2) retaining Bahamian counsel whose hourly rate would be below the above-mentioned $450 figure; (3) stipulating to measures that would decrease the length of the depositions; (4) identifying an American attorney who is admitted to the Bahamian bar; (5) seeking Csolkovits' counsel's admission to the Bahamian Bar on a pro hac vice basis for this matter; and (6) speaking to the Bahamian Attorney General's office to determine if there are any other possible avenues.

Unfortunately, the parties subsequently reported that all of these avenues turned out to be dead ends. However, the Government requested additional time to pursue the possibility of locating competent, but less expensive, Bahamian counsel. On April 29th, defense counsel advised the Court that he had learned of a Bahamian attorney - Tamica Forbes, a junior partner with the firm of Evans & Company - who could potentially assist in this matter at the lower rate of $250 per hour. On the basis of this representation, the Government has requested the Court to grant its motion for reconsideration and appoint Forbes as an associate counsel or as an expert pursuant to the CJA. Finally, on May 20th, defense counsel advised the Court that Forbes had agreed to represent Csolkovits in the depositions at the above-mentioned rate. As a result, Csolkovits has requested that

---

pay for a maximum of twenty-four hours. Should the number of hours billed exceed that amount, Csolkovits will be required to demonstrate to the satisfaction of the Court the reasonableness of that expenditure. (*See* Order of February 2, 2011, ECF No. 39, at 7 (emphasis added) ("For the reasons that have been set forth above, and pursuant to its obligations under the Mutual Assistance Treaty, the Government is directed to assume and pay the *reasonable* attorney fees necessary for the sole and singular purpose of retaining Bahamian counsel who will represent Csolkovits's interests in the depositions . . . .").

4

the Court supplement its earlier order (i.e., that the Government pay attorney fees for Bahamian counsel) by specifically identifying Forbes and her law firm as the payees.

II.     Standard of Review

The Local Rules of the Eastern District of Michigan require a party who seeks reconsideration of an order to (1) establish the existence of "a palpable defect by which the court and the parties and other persons entitled to be heard on the motion have been misled"; and (2) "show that correcting the defect will result in a different disposition of the case." E.D. Mich. LR 7.1(h)(3) (made applicable to criminal proceedings by E.D. Mich. LR 1.1(c) and E.D. Mich. LCrR 1.1). Furthermore, "the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication." *Id.*

III.    Applicability of the Treaty

The Government submits that payment of attorney fees cannot be ordered under the Treaty because the Treaty "is intended solely for mutual Legal Assistance between the criminal law enforcement authorities of the Contracting States and is not intended or designed to provide such assistance to private parties." Treaty Art. 1.3. Moreover, the Government argues that the Treaty requires that an attorney be appointed, and, inasmuch as the only available mechanism for appointing counsel is the CJA, counsel must also be paid under the CJA. Finally, the Government submits that the Court erred in ordering payment under the Treaty in these circumstances because the relevant provision is only applicable to witnesses and defendants who are brought to the United States from the Bahamas.

The Court concludes that the Government's first argument is not persuasive. The Government acknowledges that it can be required under the terms of the Treaty to pay the fees of

5

an attorney who has been appointed to represent a defendant or a witness who has been brought to the United States. (*See* Pl.'s Resp. to Def.'s Mot. to Adjourn at 4 n.2 ("[I]f a defendant or witness were brought to the United States from the Bahamas, then the United States would be responsible for paying the fees of counsel it appoints to represent that [individual]."). The Government does not explain how its reading of the effect of Article 1.3 comports with this acknowledged obligation. The Court believes that a better reading of this provision is that it is meant to ensure that private parties to civil litigation cannot make claims for payment based on the Treaty or that a violation of the terms of the Treaty would not give rise to a private right of action.

This acknowledgment points to a second problem with the Government's argument. In advancing its position, the Government argues that the Treaty "requires the appointment of that attorney with the approval of the United States," and that such appointment can only be effected pursuant to the CJA. However, if Article 7.1(c) contemplates that the Government would pay the fees of counsel for a defendant or witness who has been brought to the United States from the Bahamas at the request of the United States, it is far from clear that the CJA would be an appropriate mechanism to appoint such counsel. With respect to a criminal defendant, there is no indication that a demonstration of indigence is required to trigger the Treaty obligations. But, without a demonstration of indigence, the CJA is inapplicable. Moreover, it would seem that the CJA would be an inappropriate mechanism for appointing counsel for a witness as opposed to a defendant. Yet, as the Government acknowledges, the Treaty clearly contemplates that counsel be "appointed" in these circumstances. Therefore, the Government's argument that the CJA is "the only mechanism for the 'appointment' of counsel" (Pl.'s Mot. for Reconsideration at 3) misses the

mark.³

Finally, the Court does not agree that Article 7.1(c) is only applicable to witnesses and defendants brought to the United States. This Article provides as follows:

> 1. The Requesting State [here, the United States] shall assume all ordinary expenses required to present evidence from the Requested State [here, the Bahamas] in the Requesting State, including:
> . . .
> > (c) fees of counsel appointed with the approval of the Requesting State for a person giving testimony or for a defendant.

Treaty Art. 7.1. The Government reads this provision to mean that a Requesting State is only required to pay for attorney fees when the witness or defendant is brought from the Requested State to the Requesting State. However, the plain language of the provision does not support such a narrow reading. This provision requires the Requesting State to pay the expenses required to *present* - not to *obtain* - evidence in the Requesting State. There is nothing in the plain language of the provision that conditions the Requesting State's obligation to pay on where the evidence is obtained. Rather, the determinative factor appears to be in which state's criminal processes the evidence will be presented. This, of course, makes sense: the state that will use the evidence in its own criminal proceedings will be the state that both requests and should pay for the associated expenses, regardless of in which state the evidence is obtained.⁴

---

³The Court previously held that the CJA appeared to be an inappropriate mechanism for appointing counsel under the Treaty for an additional reason: the Treaty clearly contemplates that the Requesting Party - here, the United States through its Department of Justice - rather than the Court be required to pay these expenses.

⁴The provision does impose a different limitation: the counsel must be "appointed with the approval of the Requesting State." Absent such a limitation, perhaps the Government's fear that Csolkovits's interpretation of the Treaty would leave the Government "responsible for paying the fees of attorneys for the two Bahamian witnesses to be deposed even if no one appointed such attorneys to represent them or [someone] appointed them without the approval of

IV.     Conflict of Interest

With respect to the Government's conflict of interest argument, the Court again notes that the Government does not contest that the Treaty requires the Government to pay the fees of a counsel who has been appointed to represent a defendant who is brought to the United States for questioning. (*See* Pl.'s Resp. to Def.'s Mot. to Adjourn at 4 n.2). However, the Government's payment of the fees of a defendant's counsel would appear to present the same conflict-of-interest issue regardless of whether the deposition takes place in the Bahamas, the United States, or anywhere else. Moreover, it is expected that a Court order which requires the Government to pay the reasonable fees of a Bahamian counsel will go far to alleviate the Government's concern that this counsel "could not help but have some concerns about whether [her] fee will be paid if [she] advances some strategy or asks certain questions." (Pl.'s Mot. for Reconsideration at 4; *see also id.* at 7 ("There is simply no way of telling what might occur during the course of defendant's representation that might cause Bahamian counsel to compromise [her] duty of loyalty to the defendant in order to protect [her] interest in insuring the payment of [her] fees by the United States Department of Justice.")). Thus, the Government's conflict-of-interest argument fails to demonstrate that the Court's prior order contained a palpable defect.

Csolkovits, in disputing the Government's position that the circumstances would give rise to a conflict of interest, has expressed his willingness to waive any potential conflict. (Def.'s Mot. to Adjoun at 4 ("A record of waiver of any potential conflict issues could be easily placed upon the record if determined to be appropriate by the Court.")). Therefore, Csolkovits is directed to memorialize this waiver, in writing, by filing it via the ECF system no later than seven (7) days

---

the United States" would be realized. (Pl.'s Resp. to Def.'s Mot. to Adjourn at 4 n.2).

from the date of this order.

V.     Confrontation Clause

With respect to the Government's argument that Csolkovits will not be prejudiced if he is not represented by local counsel, the Court has already considered and rejected this argument. Nothing in the Government's brief alters the conclusion by this Court that the proposed deposition procedures - with Csolkovits's counsel being limited to submitting written questions to be posed by the presiding Magistrate - are insufficient to guarantee Csolkovits's Confrontation Clause rights.[5]

The Government continues to cite pre-*Crawford* cases that are of questionable continued vitality in light of *Crawford* and its progeny's shifting and refocusing of the Confrontation Clause analysis from indicia of reliability and face-to-face confrontation to effective cross-examination. *Crawford v. Washington*, 541 U.S. 36 (2004). The Government also attempts to minimize *Crawford*'s relevance and importance to the issue at hand, arguing that "[t]he focus of *Crawford* was on defendant's right of confrontation as it pertains to testimonial evidence contained in lab reports, not on the scope and manner of permissible cross-examination. . . . Post *Crawford* decisions . . . have not eviscerated the *Salim* and *Sturman* decisions the Government cited in

---

[5]The Court notes that there is authority to suggest that the Confrontation Clause is entirely irrelevant to the propriety of the procedures for *taking* a deposition. Rather, the Confrontation Clause concerns arise only when and if the adverse testimony is *offered into evidence* against the defendant. *E.g.*, *United States v. Drogoul*, 1 F.3d 1546, 1554 (11th Cir. 1993) ("We fail to see, however, how the mere *taking* of depositions threatens [the right of cross-examination]. Only when deposition testimony is sought to be introduced in evidence are the defendant's confrontation rights truly implicated."). However, the Court - like, presumably, the Government - does not wish to see the parties go through the expense and trouble of taking these depositions only to have their admission subsequently challenged on Confrontation Clause grounds. Therefore, it seems prudent to address these issues prior to the taking of the depositions.

previous briefs." (Pl.'s Resp. to Def.'s Mot. to Adjourn at 7). This statement is inaccurate. The case the Government describes is not *Crawford* but *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), and the impact of *Crawford* on the continued vitality of prior cases has been anything but minimal. *See, e.g.*, 4 James Wm. Moore et al., Moore's Federal Practice § 615.04 (Matthew Bender 3d ed. 1997) ("Thus, [after *Crawford*,] prior cases allowing under exceptional circumstances the admission of depositions at which the defendant did not have a full opportunity to cross-examine the deponent, should now be regarded as suspect."); Richard D. Friedman, *Adjusting to* Crawford*: High Court Decision Restores Confrontation*, 19 Crim. Just. 4, 5, 7, 13 (2004) (describing *Crawford* variously as "radically transform[ing Supreme Court] doctrine governing the Confrontation Clause," creating a Confrontation Clause "framework [that] is substantially different from the previous one," and being a "bombshell decision"); Robert P. Mosteller, Crawford v. Washington: *Encouraging and Ensuring the Confrontation of Witnesses*, 39 U. Rich. L. Rev. 511, 511 (2005) (*Crawford* "radically changed Confrontation Clause doctrine" and "has changed confrontation analysis enormously. Its concrete impact was immediate and substantial.").

However, the Government is correct when it argues that *Crawford* did not purport to specify the scope and manner of permissible cross-examination. Rather, *Crawford* asserted the primacy of the opportunity to cross examine over the now-discarded indicia of reliability test. It is precisely this opportunity to cross examine that the Court seeks to protect by ensuring that Csolkovits will be represented by counsel at the depositions.

Moreover, the post-*Crawford* cases cited by the Government - *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008), and *United States v. West*, No. 08 CR 669, 2010 WL 3324886 (N.D. Ill. Aug. 18, 2010) - do not support its position that the proposed procedures are sufficient. On the

10

contrary, they held that the Confrontation Clause was not violated despite the fact that the defendants - who were deemed flight risks or were otherwise unable to travel to the depositions - did not personally attend foreign depositions[6] where, importantly, their attorneys were permitted to directly cross-examine the deponents. *See Abu Ali*, 528 F.3d at 239-40 (describing procedure wherein defendant and one attorney participated via two-way, real-time video link and two defense attorneys attended and participated in the depositions, and stating that "[defendant's] counsel actively participated throughout these depositions, objecting frequently during the government's direct examination and cross-examining each of the witnesses at length."); *West*, 2010 WL 3324886, at *5 ("The Defendants will be able to participate in the depositions under conditions that this Court, along with other courts, finds satisfies the Confrontation Clause. Their attorneys will attend the Kabul depositions, and the Defendants may participate in them by means of video conference facilities. They may have additional counsel present with them in this country and have private telephone lines to their attorneys in Kabul to pose questions and comments concerning the witnesses' testimony."). Thus, these decisions - if anything - undermine the Government's view: the depositions in question were admissible precisely because defense counsel had the opportunity to directly and actively cross examine the adverse witnesses.

The Court concurs fully in the reasoning and conclusion in *Wilkey v. Jones*, No. 1:05-cv-588, 2009 WL 3153101, *4-6 (W.D. Mich. Sept. 8, 2009), in which the court held that a deposition was not admissible where the deponent was cross examined by an attorney who had been appointed

---

[6]In *West*, moreover, the foreign depositions were requested by the Defendants - not, as here, by the Government. Thus, the deponents were not likely to offer "adverse" testimony as to which the Confrontation Clause would even be implicated. 2010 WL 3324886, at *1.

to represent the interests of as-yet-unidentified defendants who were later charged. The court determined that the cross examination was insufficient to satisfy the Confrontation Clause because it was not performed by an attorney specifically representing the defendant:

> The Confrontation Clause guarantees the *criminal defendant* an opportunity to cross-examine the declarant of a testimonial hearsay statement. Neither *Crawford* (nor any U .S. Supreme Court or Sixth Circuit Court of Appeals decisions interpreting *Crawford* ) has held that the Confrontation Clause is satisfied so long as *someone* had an opportunity to cross-examine the declarant.
> 
> No matter how diligent the cross-examination of [the deponent] by the court-appointed attorney, that attorney did not specifically represent [the defendant]. For one thing, an attorney who specifically represented [the defendant], would have had an undivided duty of loyalty to [the defendant] alone as his client. Moreover, an attorney who specifically represented [the defendant] would have extensively discussed the case with [him] from his perspective, so he might well have asked different or additional questions of [the deponent] (or asked some of the same questions in a different sequence, with a different emphasis, or with a different tone of voice).
> 
> . . . .
> 
> And it is not for the court to speculate and *assume* that cross-examination by someone other than [defendant's] own counsel was materially identical to what [his] own counsel would have asked, or that such cross-examination was "good enough. . . ."
> 
> . . . .
> 
> This court will not depart from the words of the Supreme Court and allow cross-examination *by others* to substitute for what is a personal, individual right that belongs to the defendant and nobody else. The government should be required to comply strictly, not "substantially" or partially, with Constitutional provisions that safeguard individual rights against the overwhelming coercive power of the State - particularly when the individual's physical liberty itself is threatened by imprisonment. Just as the Supreme Court hewed strictly and literally to the words of the Confrontation Clause, this court hews strictly to the words of *Crawford*. An opportunity for the defendant to cross-examine the declarant must mean just that: an opportunity for *that defendant* to cross-examine the declarant, and nothing less.

*Wilkey*, 2009 WL 3153101, at *4-6. The Court acknowledges that some of the concerns raised in *Wilkey* are addressed by the mechanism of Csolkovits's counsel submitting written questions, but others are not. The reasoning in *Wilkey*, however, buttresses the conclusion of this Court that Csolkovits's confrontation rights would be severely undermined if he did not have the opportunity

to cross examine these witnesses through counsel specifically representing his own interests.

VI.     Conclusion

For the reasons that have been set forth above, the Court concludes that the Government has failed to demonstrate that its prior order contained "a palpable defect by which the court and the parties and other persons entitled to be heard on the motion have been misled," E.D. Mich. LR 7.1(h)(3). Therefore, its motion for reconsideration (ECF No. 40) is denied.

Csolkovits's motion to supplement the Court's prior order (ECF No. 46) is granted. The Government is directed, pursuant to its obligations under the Mutual Assistance Treaty, to assume and pay the reasonable attorney fees[7] - for up to twenty-four hours of work - necessary for the sole and singular purpose of retaining Tamica Forbes of the law firm of Evans & Company to represent Csolkovits's interests in the depositions. Should Ms. Forbes require more than twenty-four hours to complete her work, the Government will be required to pay the additional fees above $6,000 only upon a showing by Csolkovits of the reasonableness of those fees.[8] Finally, Csolkovits is directed to memorialize his waiver of any potential conflict of interest, in writing, by filing it via the ECF system no later than seven (7) days from the date of this order.

IT IS SO ORDERED.

---

[7]As noted above, Csolkovits has obtained the firm's agreement to charge for these services at the hourly rate of $250.

[8]The parties are encouraged to take whatever reasonable measures are possible to minimize the amount of time necessary to complete the required work. For example, they had earlier suggested the possibility of entering into various stipulations regarding questions and exhibits to decrease the length of the depositions. It is the Court's hope that they will do so.

Dated: June 6, 2011  s/Julian Abele Cook, Jr.
       Detroit, Michigan  JULIAN ABELE COOK, JR.
      United States District Court Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on June 6, 2011

      s/ Kay Doaks
      Case Manager